**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

v.

**Manuel LUJAN, Jr., et al., Defendants,**

**and**

**National Coal Association, et al., Defendants–Intervenors.**

**Civ. A. Nos. 87–1051, 87–1814 and 88–2788.**

United States District Court, District of Columbia.

Feb. 12, 1990.

L. Thomas Galloway, Galloway & Greenberg, Glenn P. Sugameli, National Wildlife Federation, Washington, D.C., Thomas J. Fitzgerald, Kentucky Resources Council, Frankfort, Ky., for plaintiffs.

Lisa K. Hemmer, Alfred T. Ghiorzi and Daria J. Zane, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

John A. Macleod, Crowell & Moring, Washington, D.C., for defendants-intervenors.

## MEMORANDUM OPINION

FLANNERY, District Judge.

In this matter, the court is again called upon to decide challenges to regulations implementing the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "the Act"), 30 U.S.C.A. 1201 *et seq.* The Act seeks to protect society and the environment from the harmful effects of surface coal mining, sometimes known as "strip mining," as well as from surface damage caused by underground coal mining. In these three consolidated cases, five separable issues are before the court on cross motions for summary judgment: three deal with subsidence of land over underground mines; two others concern when the Act should begin to apply to certain kinds of coal mine operations.

Plaintiffs bring this action on behalf of "environmentalist" interests and seek to overturn regulations they argue violate SMCRA. In opposition, the government defendants ask the Court to uphold the rules as a valid exercise of their authority under the Act to regulate coal mining operations.[1]

This is the fourth time this court has reviewed rules under SMCRA.[2] Most of

---

1. Plaintiffs include the National Wildlife Federation, the Kentucky Resources Council, and other organizations representing themselves to be interested in conservation, the environment, and the effects of coal mining (collectively "NWF"). Defendants are the U.S. Secretary of the Interior, the U.S. Department of the Interior, and the Director of the Office of Surface Mining Reclamation and Enforcement, an agency within the Interior Department charged with implementing SMCRA (collectively "the government" or the "Secretary"). Two organizations said to represent the coal mining industry, the National Coal Association and the American Mining Congress ("industry"), were granted leave to intervene on the side of the government.

2. The Secretary published interim regulations under the Act in 1977, and this court ruled on challenges to them in two opinions, *In re Surface Mining Regulation Litigation,* 452 F.Supp. 327 (D.D.C.1978) and *In re Surface Mining Regu-*

*lation Litigation,* 456 F.Supp. 1301 (D.D.C.1978). These opinions were affirmed in part and reversed in part by *In re Surface Mining Regulation Litigation,* 627 F.2d 1346 (D.C.Cir.1980). In 1979, the Secretary published permanent program regulations. Industry and environmentalist groups challenged hundreds of aspects of these, which this court ruled on in three opinions, *In re Permanent Surface Mining Regulation Litigation I,* 13 Env't Rep. Cas. 1586 (D.D.C. 1979) (preliminary injunction); *In re Permanent Surface Mining Regulation Litigation I,* No. 79–1144, Mem. Op. (D.D.C. Feb. 26, 1980), 14 Env't Rep. Cas. 1083 ("PSMRL I, Round I"); and, *In re Permanent Surface Mining Regulation Litigation I,* No. 79–1144, Mem. Op. (D.D.C. May 16, 1980), 19 Env't Rep. Cas. 1477 ("PSMRL I, Round II"). One aspect of these was rejected on appeal. *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514 (D.C.Cir.), *cert. denied,* 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981).

the issues decided today arise from rulings the court made in 1984 during its third review of SMCRA regulations. In several instances, the Court remanded regulations back to the Secretary to be revised or for additional comment, and plaintiffs now challenge the Secretary's actions on remand.

## I.  Standard of Review

Before taking up plaintiffs' five challenges, the court will discuss the proper standard of review. SMCRA § 526(a)(1), 30 U.S.C.A. § 1276(a)(1), provides:

> Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law.

The court has stated: "This is a narrow scope of review. This court will not substitute its judgment for that of the agency." *PSMRL II, Round I,* Mem. Op. at 2, 21 Env't Rep. Cas. at 1194. But, while "reasonable agency interpretive positions must be upheld," the Courts "remain the final arbiters of statutory meaning." *Id.* (Citations omitted.) This Court also recognized that:

> The problem facing the reviewing court is exacerbated when an agency reverses its prior position. Although the court must not put the agency in a straight jacket to prevent any change in a course once set, the court must be satisfied that the agency states permissible reasons for this change....
>
> This court will examine the regulations and uphold them to the extent they are consistent with the language of SMCRA

as interpreted in light of the legislative history.... If [the Secretary's] interpretation frustrates the policy that Congress sought to implement, no amount of deference can save it.

*Id.,* Mem. Op. at 3, 21 Env't Rep. Cas. at 1194–95 (internal quotation marks and citations omitted). As was the case in 1984, several issues before the Court today result from fundamental changes in the Secretary's original position when he first published the permanent regulations in 1979.

## II.  Subsidence Issues

"Subsidence occurs when a patch of land over an underground mine sinks, shifts, or otherwise changes its configuration. It is a costly and serious problem, particularly in urban areas, where land overlying and adjoining underground mines has been developed." *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694, 739 (D.C.Cir.1988).

### A.  30 C.F.R. § 817.121(c), *subsidence damage to structures.*

■ NWF first challenges whether the Secretary may limit the duty of an underground coal operator to correct material damage to structures caused by subsidence. The court must disapprove the Secretary's rule.

Before 1983, the Secretary's rules required an operator to correct material subsidence damage both to structures and to land, regardless of state law. As the rule now reads, an operator must correct such damage to structures only to the extent state law requires. 30 C.F.R. § 817.121(c)(2) (1988).[3] NWF argues that

---

By this time, a new Presidential Administration had taken office, and the Secretary of Interior, James Watt, decided to revamp the permanent regulations under SMCRA. As a result, the Court of Appeals remanded the entire matter back to the Secretary. Secretary Watt's program also saw extensive challenges, and the court ruled on these in *In re Permanent Surface Mining Regulation Litigation II, Round I,* No. 79–1144, Mem. Op. (D.D.C. July 6, 1984), 21 Env't Rep. Cas. 1193 ("PSMRL II, Round I"); *In re Permanent Surface Mining Regulation Litigation II, Round II,* No. 79–1144, Mem. Op. (D.D.C. Oct. 1, 1984), 21 Env't Rep. Cas. 1724 ("PSMRL II, Round II"); *In re Permanent Surface Mining Regulation Litigation II, Round III–VER,* No. 79–

1144, Mem. Op. (D.D.C. Mar. 22, 1985), 22 Env't Rep. Cas. 1557 ("PSMRL II, Round III–VER"); and, *In re Permanent Surface Mining Regulation Litigation II, Round III,* 620 F.Supp. 1519 (D.D.C. 1985) ("PSMRL II, Round III"). While these were on appeal, the Court of Appeals remanded the case for this court to address questions of standing, which were decided in *In re Permanent Surface Mining Regulation Litigation II,* No. 79–1144, Mem. Op. (D.D.C. Aug. 10, 1987). The Court of Appeals ultimately affirmed in part and reversed in part these five rulings in *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694 (D.C. Cir.1988).

3.  In contrast, the operator must correct material damage to surface lands quite apart from what

the state-law limitation on the duty to correct subsidence damage to structures is contrary to the Act and arbitrary. The court agrees with plaintiffs and finds that this limitation lacks a proper basis in the statute. The Court will remand the rule to be revised.

1.

Placing a state law limitation on the duty to correct subsidence damage has practical effects not plain from the text of the rule. As the Supreme Court noted in regard to Pennsylvania:

[State property law] recognizes three separate estates in land: The mineral estate; the surface estate; and "the support estate." Beginning well over 100 years ago, land owners began severing title to underground coal and the right of surface support while retaining or conveying away ownership of the surface estate. It is stipulated that approximately 90% of the coal that is or will be mined by [a number of large underground coal mining companies] in western Pennsylvania was severed from the surface in the period between 1890 and 1920. When acquiring or retaining the mineral estate [the underground coal operators] or their predecessors typically acquired ... a

waiver of any claims for damages that might result from the removal of coal. *Keystone Bituminous Coal Ass'n v. De-Benedictis*, 480 U.S. 470, 107 S.Ct. 1232, 1238–39, 94 L.Ed.2d 472 (1987).[4] The upshot is that state property or contract law may let a coal operator dig a mine underneath a building someone else owns, cause the land to subside, damage the building, and bear no legal liability for the damage. This may arise because a building owner or his predecessor contracted away or waived the right to recover for damage from subsidence or other mining work. It may also arise because the building owner's deed to the land conveyed only a surface estate that does not give him the right to subjacent support.[5] As *Keystone* suggests, the act giving an operator the right in state law to cause subsidence damage without liability often took place more than half a century or more ago.

This Court has decided related questions twice before. When the Secretary first issued regulations on subsidence control and surface owner protection in 1979, they required an underground coal operator to correct material damage from subsidence both to surface land or to structures.[6] 30

---

state law may recognize. 30 C.F.R. § 817.121(c)(1) (1988); *see PSMRL II, Round II,* Mem. Op. at 3–8, 21 Env't Rep. Cas. at 1728–29. Subsection (c) reads:

(c) The operator shall—
(1) Correct any material damage resulting from subsidence caused to surface lands, to the extent technologically and economically feasible, by restoring the land to a condition capable of maintaining the value and reasonably foreseeable uses which it was capable of supporting before subsidence; and
(2) To the extent required under applicable provisions of State law, either correct material damage resulting from subsidence caused to any structures or facilities by repairing the damage or compensate the owner of such structures or facilities in the full amount of the diminution in value resulting from the subsidence.

4. The parties concede that other states have laws giving rise to similar situations, notably in West Virginia and Kentucky. 52 *Fed.Reg.* 4860, 4865 (1987) (Feb. 17, 1987). In 1983, Illinois, Pennsylvania, West Virginia, Kentucky, Virginia, and Utah accounted for 87% of the nation's underground coal production. *Id.*

5. Subjacent support is the "right of land to be supported by the land which lies under it."

*Black's Law Dictionary* 1593 (Rev'd 4th ed. 1968).

6. The original rule, 30 C.F.R. 817.124, published at 44 *Fed.Reg.* 14902 (March 13, 1979), read:
(a) ...
(b) Each person who conducts underground mining which results in subsidence that causes material damage or reduces the value or reasonably foreseeable use of the surface lands shall, with respect to each surface area affected by subsidence
(1) Restore, rehabilitate, or remove and replace each damaged structure, feature or value, promptly after the damage is suffered, to the condition it would be in if no subsidence had occurred and restore the land to a condition capable of supporting reasonably foreseeable uses it was capable of supporting before subsidence;
(2) Purchase the damaged structure or feature for its fair market, pre-subsidence value and shall promptly after subsidence occurs, to the extent technologically and economically feasible, restore the land surface to a condition capable and appropriate of supporting the purchased structure, and other foreseeable uses it was capable of supporting before mining.... or

C.F.R. § 817.124 (1979). This Court upheld the rule against industry challenge. *PSMRL I, Round I,* 14 Env't Rep. Cas. 1083, 1106.

In 1982, the Secretary proposed to amend and combine rules on subsidence so that 30 C.F.R. § 817.121 "would provide all the requirements for subsidence control." 47 *Fed.Reg.* 16604 (Apr. 16, 1982).[7] When the Secretary issued the Final Rule he:

> establishe[d] a distinction between damage to land and damage to structures or facilities.... [A]ll subsidence-caused material damage to the land is required to be repaired. [Underground coal mine] operator responsibility for material damage caused to structures or facilities is tied to liability under State law. If the operator has no liability under State law, the material damage need not be repaired and compensation need not be paid.

48 *Fed.Reg.* 24638 (June 1, 1983).

Both industry and environmentalists challenged the 1983 Final Rule. This Court upheld it against an industry challenge to the requirement to restore land materially damaged by subsidence. *PSMRL II, Round II,* Mem. Op. at 3–8, 21 Env't Rep. Cas. at 1727–29. The Court rejected the

view that the rule "infringes on state laws that provide remedies in tort and contract for subsidence damage." *Id.,* Mem. Op. at 6–7, 21 Env't Rep. Cas. at 1729.[8]

For their part, the environmentalists challenged the rule limiting the duty to correct subsidence damage to structures. This Court did not reach the merits, however. Instead, it remanded the matter back to the Secretary for proper notice and comment.[9]

In response to this ruling, the Secretary published a new Final Rule in 1987, 52 *Fed.Reg.* 4860 (1987). The 1987 version made almost no changes to the remanded text, and the Secretary readopted the view that underground operators need only pay owners for or correct subsidence damage to structures or facilities "to the extent required under applicable provisions of State law." 30 C.F.R. 817.121(c)(2) (1988).[10]

The Secretary first defended the limitation on the ground that the Act itself "does not require operators to repair subsidence-caused material damage to structures irrespective of State law." *Id.* at 4863. In the Secretary's view, "[l]iability for damage to surface and subsurface structures and facilities under section 507(f) of the Act is tied to liability under State law because the

---

> (c) Each person who conducts underground mining activities will compensate the owner of any surface structure in the full amount of the diminution in value resulting from subsidence ...

7. With only minor changes in wording, former § 817.124's requirement to correct damage from subsidence became subsection (c) of the new rule § 817.121. In the preamble, the Secretary stated this change "would streamline the rules and eliminate excess verbiage" and was "not intended as a substantive change." *Id.*

8. The Court stated that:

These remedies redress injuries suffered by private parties, but not necessarily to the land itself. As the Secretary points out, private parties should not be able to circumvent Congress' will by forming contracts. Congress did not pass this Act solely to protect individuals' property rights. This Act was passed to protect this nation's land and shield "the environment from the adverse effect of surface coal mining operations," and surface effects of underground mining for generations yet unborn.

9. The Court found that the Final Rule represented a "radical change," and the Secretary had

given no notice proposed rule that he was thinking about such "a complete reversal of policy." *PSMRL II, Round II,* Mem. Op. at 10–11, 21 Env't Rep. Cas. at 1730–31.

10. The preamble to the 1987 rule states that the language:

accommodates situations in which the operator is not liable for subsidence damage to surface structures under State law. Conditioning liability for restoration of materially damaged structures upon State law lessens the concern that the contract in which the operator may have obtained the right to subside the surface under a structure will be impaired. In States which have not enacted special subsidence legislation, State property rights, as established by contracts, deeds, and other agreements, and interpreted by judicial decisions will determine whether the operator is liable to the surface owner. Liability of the operator where the owner of the surface facility may have conveyed the right to support or may have waived it will also be left to determination under State law. 52 *Fed.Reg.* 4860, 4863 (Feb. 17, 1987).

Act was not intended to create additional property rights...." *Id.*[11] Further, § 516(b)(1) of the Act "requires underground mine operators to prevent subsidence-caused material damage to the 'extent technologically and economically feasible' and to maintain the value and use of 'surface lands.' This provision does not itself require the restoration of structures damaged by subsidence." *Id.*[12] Thus, "[a]lthough the 1979 rule did not limit the compensation requirement to situations where liability exists under State law, a more precise reading of section 507(f) supports the imposition of such a constraint in this final rule." *Id.*

The Secretary next justified the rule on the ground that "[i]n policy, as well as law, there is clear reason to distinguish protection provided for land and structures." *Id.*

> Where an underground mine operator purchases from the surface owner the right to subside the surface, the individual's property rights are protected, but the long term public interest in the land is not protected. Thus, [the rule's requirement to restore land without regard to state law] functions to prevent this injury to the land by assuring that in all cases, irrespective of private contract, this valuable natural resource will be restored.... [N]o environmental or public interest exists in protecting a building or structure where its present or past owner has either conveyed or waived a right to subjacent support....
>
> While private parties may not be motivated to protect the environment, they have a great incentive to protect structures that they own. State law has traditionally provided remedies in contract and tort for those parties who own subsidence-damaged structures. Accordingly, it is inappropriate for ⌐ɹne Secretary] to step in and protect owners of these structures thereby creating an additional private property right which clearly was not intended by Congress.

*Id.* at 4863–64.

Last, the Secretary argued that other regulations protect the structures in which the public has an interest. He cited 30 C.F.R. 817.121(d) which "prohibits underground mining activities beneath or adjacent to public buildings and facilities, churches, schools and hospitals, and large bodies of water unless an operator can demonstrate before a permit is issued that subsidence will not cause material damage." *Id.* at 4864. The Secretary added that if subsidence damages these facilities or features, "the regulatory authorities are empowered to suspend mining until the operator ensures that no further material damage will occur (*see* 30 C.F.R. 817.-

**11.** SMCRA § 507(f), 30 U.S.C.A. § 1257(f), states:

Each applicant for a permit shall be required to submit ... a certificate issued by an insurance company ... certifying that the applicant has a public liability insurance policy in force for the surface mining and reclamation operations.... Such policy shall provide for personal injury and property damage protection in an amount adequate to compensate any persons damaged as a result of surface coal mining and reclamation operations ... and entitled to compensation under ... State law.

**12.** The Secretary also explained that § 515(b)(2), 30 U.S.C.A. 1265(b)(2), does not require damage to structures be corrected. Section 515 sets out performance standards for surface mining, while § 516 sets out standards for underground mining. Section 516(b)(10), 30 U.S.C.A. 1266(b)(10), provides that "with respect to other surface impacts" of underground operations not specified in the performance standards for underground mines, the underground miner must "operate in accordance with the standards established" for surface mining operations in § 515. Section 515(b)(2) dictates that a surface operator must "restore the land affected to a condition capable of supporting the uses which it was capable of supporting prior to any mining." This Court had earlier held that this requirement could be applied to underground mine operations through § 516(b)(10). See *PSMRL I, Round I*, 14 Env't Rep. Cas. at 1108; *PSMRL II, Round II*, Mem. Op. at 4–6, 21 Env't Rep. Cas. at 1728. In *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d at 740–41, the Court of Appeals stated that the confluence of §§ 515(b)(2) and 516(b)(10) does not reach subsidence damage because subsidence is mentioned in § 516(b)(1) and is not a surface impact not specified. Instead, the Court of Appeals upheld the duty to restore subsidence damage to land based upon § 516(b)(1) alone. The Secretary published the 1987 preamble to 30 C.F.R. § 817.121 before *Nat'l Wildlife Fed'n v. Hodel* was decided, in other words when the view that § 515(b)(2) governed subsidence was still good law.

121(e))." *Id.* Further, "if imminent danger from underground mining exists to inhabitants of urbanized areas, cities, towns or communities, such mining must be suspended." *Id.*

### 2.

After carefully reviewing the Act's language, previous court rulings on the issue of subsidence, the Act's legislative history, and the Secretary's justification for the limitation on the duty to correct subsidence damage to structures, this Court finds that the 1987 version of § 817.121(c)(2) cannot stand.

Both this Court and the Court of Appeals have read SMCRA's language and its legislative history as sustaining the Secretary's authority to require underground miners to restore land damaged by subsidence.[13] Now the court must decide whether the same language can sustain a rule that cuts down the duty to restore damage to structures by reference to state law. The Court finds that the statute's language shows that Congress did not differentiate based upon state law between the duties of underground operators with respect to subsidence damage to land and to structures. Instead, § 817.121(c)(2) is inconsistent with the provisions of the Act in § 102(b) and the first and third clauses of § 516(b)(1).

■ First, the Court must reject the Secretary's argument that the Act's sole purpose was to safeguard the "public" interest in the environment, and, thus, state tort and contract law is enough to protect any private interests. Congress stated in the Act that two of its purposes are to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations," SMCRA § 102(a), 30 U.S.C.A. § 1202(a), and to "assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully protected from such operations." SMCRA § 102(b), 30 U.S.C.A. § 1202(b).[14] In this regard, Congress was not concerned solely with the environment, but intended to ease hardship that coal mining sometimes causes society, its people, and their property.

Congress specifically required underground operators to "adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible ... and maintain the value and reasonably foreseeable use of such surface lands...." SMCRA § 516(b)(1), 30 U.S.C.A. § 1266(b)(1).[15] Not a word in any of these is said about state law.

In the Court's view, "fully protected" means just that, not fully protected to the extent that state law provides. No reasonable person would think full protection plainly means that (1) an operator may cause land underneath *someone else's* house to shift or drop, weakening foundations, cracking walls, bending floors, breaking windows, perhaps collapsing the home; and (2) the operator may walk away from this shambles with a duty to restore the homeowner's land but not the home except as state law provides. Still less would a reasonable person believe this comports with the plain meaning of maintaining "value and reasonably foreseeable use" of the surface land. Nor would a reasonable person think that preventing material damage

---

13. *See PSMRL II, Round II,* Mem. Op. at 6, n. 4, 21 Env't Rep. Cas. at 1728–29, n. 4 (Court cannot subscribe to view that Congress intended to require underground miners to prevent subsidence damage to land but did not intend that such land be restored if damaged when Congress showed such obvious concern about subsidence); *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d at 741 (maintaining value of land may well require restoring it when legislative history makes clear Congress regarded subsidence as serious problem and suggests that reclamation anticipated for broad range of mining impacts).

14. Under the Act, the "surface impacts incident to an underground coal mine" are defined to be "surface coal mining operations." SMCRA § 701(28)(A), 30 U.S.C.A. § 1291(28)(A).

15. To this section, Congress added two provisos: (1) the above cited language is excepted "in those instances where the mining technology used requires planned subsidence in a predictable and controlled manner[;]" and (2) *"Provided, That nothing in this subsection shall be construed to prohibit the standard method of room and pillar mining."* SMCRA § 516(b)(1), 30 U.S.C.A. 1266(b)(1).

plainly means that the operator need do nothing about damage that actually occurred unless State law directs. Yet these are the consequences of just the sort of "plain meanings" that the Secretary and industry ask the Court to adopt.

In this regard, it is hard to see how the Congressional mandates of preventing subsidence causing material damage and maintaining the value and use of surface lands can be given effect under § 817.121(c)(2). In the Court's view, preventing subsidence causing material damage inevitably requires that damage that does occur must be corrected. If Congress had merely wanted operators to prevent subsidence, it would not have added the additional words "causing material damage." This shows that prevention of material damage is the object of the clause. This is made clearer by § 516(b)(1)'s later stricture that operators may engage in mining methods that use planned subsidence, and specifically, standard room-and-pillar mining. The court earlier rejected an interpretation of this clause that the duty to prevent subsidence causing material damage did not require that damage be restored. In *PSMRL II, Round II*, industry argued that "although Congress was concerned with [the problem of subsidence], and explicitly required underground miners to do everything feasible to prevent subsidence that materially damaged land, it allowed this land to be left in its damaged condition once subsidence occurred." *PSMRL II, Round II*, 21 Env't Rep. Cas. at 1728. In response, the court stated:

> The effect of industry's interpretation of this area of the statute would be to allow the dictates of section 516(b)(1) to be rendered virtually meaningless. A coal operator would have to indicate that he is taking measures to prevent subsidence in order to obtain a permit. Once mining was underway, there would be nothing in the Act to stop the operator from abandoning these measures. The land could be materially damaged, and without a requirement of restoration, the environment would be no better off, with regard to subsidence, than it was before the Act was passed. This court cannot subscribe

to such a result involving an area of obvious concern to Congress.

*Id.* at n. 4.

This reasoning applies here, too. This clause in § 516(b)(1) contains no limitation under state law, and it is not limited to land. The clause applies to both land and structures. If the court were to sustain the Secretary's rule, structures "could be materially damaged, and without a requirement of restoration" going beyond state law, those with interests in appurtenances to the land, "would be no better off, with regard to subsidence, than [they were] before the Act." Yet Congress in § 102(b) intended to give these persons "full protection" from mining operations. Obviously, to the extent that state law already provides redress in tort or contract for subsidence damage to structures, SMCRA simply adds an additional protection. But for those persons without recourse at state law, SMCRA was intended to provide protection they did not have. Under § 817.121(c)(2), the protection has all but vanished. Congress intended otherwise.

The Court further finds that § 817.121(c)(2) runs afoul of the third clause in § 516(b)(1). This requires the operator to maintain the value and reasonably foreseeable use of surface lands. The Secretary and industry argue that § 516(b)(1) speaks only of surface lands when it discusses maintenance of value and use. In their view, "surface lands" means land in its natural state as distinguished from land in an improved state with structures on it, or the structures themselves. Mem. of Federal Defts in Supp. of Cross–Motion for Summary Judgment at 5. This is a peculiarly strained reading. It ignores the obvious: the value of land is tied to the value of structures on it, and the use of land mostly depends upon the structures it can support. It is unclear how either surface land's value or its reasonably foreseeable use can be maintained when structures on the surface land—which give the land much of its value and define its use—may be damaged by subsidence without such harm having to be corrected.

The Secretary and industry also are on weak, if not subsided ground in arguing something akin to *expressio unius est exclusio alterius*. They suggest that when Congress wanted to protect structures elsewhere in the Act it mentioned them by name. That Congress here mentioned only surface lands, according to defendants, indicates Congress meant to exclude structures from the duties it imposed in this section. At the same time as the government and industry ask the Court to read any thought of structures *out* of maintaining value and use of surface lands (as well as preventing subsidence causing material damage), they ask the court to read *into* the same phrases "except as provided for by state law." If expressing something one place is excluding it elsewhere, then it is to be noted that Congress carefully stated when it wished the federal rights and duties it created to be preempted by state law.

For example, SMCRA § 510(b)(6), 30 U.S.C.A. § 1260(b)(6), contemplates a situation where the private mineral estate has been severed from the private surface estate. The section requires the operator seeking a permit to prove that it has the private surface estate owner's consent, or the operator has a valid conveyance granting the right to mine the mineral estate. When a conveyance is unclear, "the surface-subsurface legal relationship shall be determined in accordance with State law." Thus in a situation directly related to the issue before the Court, Congress specifically indicated a role for State law. The Court is not inclined to construe into another related section the same or similar role for State law, when it is not mentioned at all.[16]

Further, in an Act mostly dealing with surface mining, a section discussing underground mining most likely intends that the phrase "surface lands" is to be distinguished from land underground, rather than from structures on the land. Other than to argue the Secretary's position, why must "surface lands" mean only those lands that are unimproved and in their natural state, rather than improved land? The land in Manhattan underneath the Empire State Building is surface land as surely as is land in the wilderness untouched by human hands.

Congress recognized that the land that subsidence threatens most is land with improvements, not land in its natural state or even cleared, vacant land. Congress noted that "[g]enerally no appreciable impact is realized on agricultural and similar types of land and productivity is not affected." H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 126, *reprinted in 1977 U.S.Code Cong. & Admin.News* 593, 658. It went on to say:

> [W]hen subsidence occurs under developed land such as that in urbanized areas, substantial damage results to surface improvements be they private homes, commercial buildings or public roads and schools.... The estimated cost for controlling subsidence under the 200 urbanized areas now affected is approximately $1 billion. It is the intent of [Section 516] to provide the Secretary with the authority to require the design and conduct of underground mining methods to control subsidence to the extent technologically and economically feasible in order to protect the value and use of surface lands."

*Id.*

It is irrational to think that Congress, when so worried about subsidence, crafted remedies for land where subsidence has no appreciable impacts but not for land where it does.

Last, the court disagrees that § 817.121(c)(2) and the other parts of the

---

**16.** The *expressio* rule more commonly stands means that "if a statute specifies one exception to a general rule or assumes to specify the effects of a certain provision, other exceptions or effects are excluded." *Black's Law Dictionary* 692 (Rev'd 4th ed. 1968). Section 516(b)(1) excepts many things from its duties: (1) measures not consistent with known technology; (2) measures that would prevent subsidence causing material damage but that are not technologically or economically feasible; (3) instances when the mining technology used requires planned subsidence in a predictable and controlled manner; (4) anything that could be construed to prohibit the standard method of room and pillar mining. But, the section does not list among its exceptions that the duties are limited to the extent required by state law.

rule protect structures. The Secretary contends that restrictions on mining near public buildings or in built-up areas make a full duty to restore damaged structures unnecessary. A close reading of the rest of the regulation and the Secretary's explanation of it shows that even in these cases mining may cause damage. As the Secretary concedes, § 817.121(e) contemplates that subsidence damage could happen to "public buildings and facilities, churches, schools and hospitals, and large bodies of water." This is so even though an operator is not supposed to get a permit to mine beneath or near them unless the operator shows that material damage will not occur. 52 *Fed.Reg.* at 4864. The Secretary states that "[i]f damage is caused to such facilities or features regulatory authorities are empowered to suspend mining until the operator ensures that no further damage will occur ..." *Id.* The Secretary also relates that mining must be suspended if it poses an imminent danger to "inhabitants of urbanized areas, cities, towns or communities." *Id.* The court finds that imminent danger usually is shown by actual damage from mining. Further, the things most likely to be damaged in "urbanized areas, cities, towns or communities" are the houses of their "inhabitants." Yet, under the Secretary's rules, the only remedy is to cease mining. The coal operator would not have to repair structural damage, even in these grave situations, unless state law dictated otherwise. The court cannot agree that these "rules will amply protect the public interests endangered by subsidence" if there is only a limited duty to correct subsidence damage to structures.

For these reasons, the Court must reject the Secretary's rule as contrary to the language of §§ 102(b) and 516(b)(1) of the Act. The court will remand this rule to the Secretary to be revised by striking the reference to state law.

### B. 30 C.F.R. § 784.20(d), *presubsidence surveys.*

■ Next, NWF argues that the secretary has improperly deleted several requirements from the procedures for drawing up a subsidence control plan. The court rejects this argument and upholds the rule.

NWF challenges the current form of subsection (d) of 30 C.F.R. § 784.20. Section 784.20 requires certain underground coal operators to draw up a subsidence control plan and spells out what must be included in such a plan.[17] The Secretary amended the rule in 1983, reworking the 1979 subsection (d). Historically, subsection (d) generally has required the subsidence control plan to include a description of how the operator would determine how much subsidence occurs so that the operator can correct the material damage from it. The 1979 text of § 784.20(d) required the operator to describe the steps it would take to determine the degree of subsidence damage, including results of pre-subsidence surveys and any monitoring proposed. The current subsection (d) only requires the operator to describe any monitoring planned to determine the start and degree of subsidence. In particular, the current subsection (d) does not speak of presubsidence surveys at all. NWF argues that the Secretary improperly deleted from the current subsection (d) the requirements found in

---

17. Section 516 of the act, 30 U.S.C.A. § 1266, governs the "surface effects of underground coal mining operations." In essence, the section requires underground operators to get a permit for their mining operation, much the same as their surface mining colleagues must. In putting out the permanent rules covering underground mine permits in 1979, the Secretary required underground mine operators to survey the area they wanted to mine. If the survey showed that subsidence could harm buildings or certain types of land around the mine, the operator had to submit a subsidence control plan with the application for a permit. 30 C.F.R.

§ 784.20 (1980) (44 *Fed.Reg.* 14902, 15366–69 (March 13, 1979)). In such plans, operators had to describe how they would:

(a) dig the mine and whether the method would cause subsidence;

(b) keep subsidence from causing harm;

(c) cut down on the harm caused by any subsidence that did take place; and,

(d) measure how much harm subsidence had caused.

This court upheld 30 C.F.R. § 784.20's requirement for a subsidence control plan. *PSMRL I, Round I,* 14 Env't Rep. Cas. at 1097–98.

the 1979 version and asks the court to reinstate them.

The Secretary justifies changing subsection (d) on the ground that it was redundant and created unneeded paperwork for operators. In reviewing § 784.20(d) through its successive forms, the court finds that the Act does not speak to this issue. Therefore, the matter is within the Secretary's sound discretion. The court also finds that Secretary's has put forward good reasons for his decision. Further, the resulting rule is in keeping with the language and intent of the Act. The Court thus sustains the current text of § 784.20 in so far as NWF has challenged it.[18]

1.

The 1979 version of 30 C.F.R. § 784.20(d) stated that the subsidence control plan should include:

(d) A detailed description of measures to be taken to determine the degree of material damage or diminution of value or foreseeable use of the surface, including such measures as—

(1) The results of pre-subsidence surveys of all structures and surface features which might be materially damaged by subsidence.

(2) Monitoring, if any, proposed to measure deformations near specified structures or features or otherwise as appropriate for the operation.

30 C.F.R. 784.20 (1980) (44 *Fed.Reg.* 14902 (March 13, 1979)).

The current rule that NWF challenges reads:

(d) A description of monitoring, if any, needed to determine the commencement and degree of subsidence so that, when appropriate, other measures can be taken to prevent, reduce, or correct material damage in accordance with § 817.121(c) of this chapter.

30 C.F.R. 784.20(d) (1988) (52 *Fed.Reg.* 4860 (Feb. 17, 1987).

As discussed in the margin, Secretary Watt decided to amend § 784.20 in 1982. Between 1982 and 1987, the Secretary put forth several different proposals to amend § 784.20.[19] Each of these has cut out some or all of the 1979 subsection (d), particularly the reference to presubsidence surveys. The preamble to rules proposed in 1982 stated that other rules separately required the operator to correct material damage from subsidence. 47 *Fed.Reg.* 16604, 16605 (Apr. 16, 1982). "[A]n appropriate means of determining the degree of subsidence related damage ... is implicit" in the other rule on the duty to correct material damage. *Id.* "A separate submittal detailing methods for evaluating such damage is not deemed necessary. Therefore, the requirement [to describe how to measure damage] would be deleted to reduce the reporting burden on the operator." *Id.*

The preamble to the 1983 final rules rejected a suggestion to keep the old language of subsection (d), stating:

**18.** In its opening brief NWF also contended that the Secretary improperly added the words "if any" in the current version of § 784.20(d) when discussing monitoring. The 1979 version of the rule directed operators to discuss in their subsidence control plan "monitoring, if any, proposed...." The June 1, 1983, Final Rule did not contain the "if any" language. The rule before the Court states that the plan must contain a "description of monitoring, if any, needed...." The Secretary responded that dropping "if any" was a misprint that was corrected at 48 *Fed.Reg.* 44778 (Sept. 30, 1983), where he stated that "[i]t was intended that this final rule provision read the same as the previous rule. Therefore the addition of the two words 'if any' is made to follow the intentions of the final rule as stated in the preamble." In its reply brief, NWF conceded this point. Pltfs' Reply at 37 n. 31.

**19.** As part of his general overhaul of the SMCRA rules, Secretary Watt proposed to revamp § 784.20 and shorten it. 47 *Fed.Reg.* 16604 (Apr. 16, 1982). The proposed new rule created a two-tiered scheme dictating that every underground miner file a general subsidence control plan with the application for a permit and then follow up with a detailed plan when such was needed. In the course of proposing the new scheme, the Secretary dropped the old rule's language about including in the control plan the steps to be taken, such as pre-subsidence surveys and monitoring, to measure how much harm subsidence had caused.

Ultimately, the Secretary decided against the two-tiered scheme and announced a final rule that kept the basic structure of the old rule. 48 *Fed.Reg.* 24638 (June 1, 1983). The final rule did not restore language about describing ways to measure harm from subsidence, however.

It is not necessary to impose this additional requirement in the subsidence control plan. It may be to the operator's advantage to conduct presubsidence surveys or monitoring to avoid unnecessary liability or complications with the surface owners. However, the Act does not require the operator to conduct such surveys or monitoring. Further, to the extent that such measures are applicable to other aspects of the subsidence control plan, they can be included as an element of the plan.

48 Fed.Reg. 24638 (June 1, 1983)[20]

NWF and other environmental groups challenged the final 1983 version of § 784.20 rule, alleging that the Secretary had "deleted without explanation" the use of monitoring, if any, and presubsidence surveys to determine the degree of material damage. *PSMRL II, Round II*, Mem. Op. at 14, 21 Env't Rep. Cas. at 1731. This Court decided that this subsidence-related issue should be remanded to the Secretary because it bore so closely on the issue of correcting subsidence damage to structures, discussed above, which the Court also had remanded for further notice and comment. *Id.* at 1732. Thus, the Court did not reach the merits of NWF's challenge to § 784.20's 1983 version.

The Secretary sought additional comments on § 784.20, 50 *Fed.Reg.* 27910 (July 8, 1985), and 19 months later announced a new Final Rule for § 784.20. 52 *Fed.Reg.* 4860 (Feb. 17, 1987).[21] The 1987 Final Rule again dropped the presubsidence survey from § 784.20(d), but made other changes in the subsection "to make clear that monitoring may be appropriate regardless of the mining method to be employed by the operator." *Id.* at 4862. The preamble to the 1987 Final Rule stated that the Secretary:

> continues to believe that the requirement is redundant. Former § 784.20(d)(1) is duplicative of the requirement in the introductory paragraph of § 784.20 requiring a premining survey.... Another commenter agreed with [the Secretary] that the 1979 pre-subsidence survey requirements are redundant stating "there is no distinction between the requirements for a survey showing structures and renewable resource lands and a pre-subsidence survey.... Moreover, [the rule] provides the opportunity ... to require whatever additional information is deemed necessary....

*Id.*

### 2.

NWF calls the Final Rule a "classic example of arbitrary agency action. There is simply no rational ground or basis to argue

---

20. The final 1983 version of § 784.20 matched the 1979 rule in requiring the operator to survey the area to be mined to see if subsidence would harm buildings and certain types of land, and to prepare a subsidence control plan if harm would take place. In the plan, the operator had to:

    (a) describe the method of removing coal;
    (b) submit a map of the underground workings showing where subsidence could occur;
    (c) describe physical conditions affecting the likelihood or extent of subsidence or harm from it;
    (d) describe steps to prevent or minimize subsidence and damage, except when mining methods using planned subsidence were proposed;
    (e) describe the effects of planned subsidence, if any;
    (f) describe steps to cut down on or remedy harm from subsidence; and,
    (g) submit other information needed by the regulatory authority to ensure the mine meets performance standards.

48 *Fed.Reg.* 24638 (June 1, 1983).

21. As now written, § 784.20 requires an operator to include in a subsidence control plan:

    (a) a description of the method of removing coal;
    (b) a map of the underground workings;
    (c) a description of conditions affecting the likelihood or extent of subsidence or harm from it;
    (d) a description of monitoring, if any, of subsidence;
    (e) a description of subsidence control measures to prevent or minimize subsidence or harm from it, unless a mining method using planned subsidence is intended;
    (f) a description of the effects of planned subsidence;
    (g) a description of measures to cut down on or remedy any damage from subsidence; and,
    (h) other information the regulatory authority needs to ensure the mine will meet certain performance standards.

30 C.F.R. 784.20 (1988).

... that the mandatory requirement in the 1979 regulations is redundant with any provision in the new regulations." Pltfs' Mem. in Supp. at 20. According to NWF, the former subsection "served a vital purpose in requiring the operator to identify and then implement specific steps to determine the degree and extent of subsidence damage caused by his mining operations." *Id.* at 19. NWF argues further that:

> Notably missing from the subsidence control plan required by the new regulations is any requirement to determine the degree of damage or diminution of value or foreseeable uses [of land] caused by subsidence.... It is impossible to develop an intelligent plan to repair the damage caused by subsidence or address the diminution of value ... until the extent of that damage or diminution of value is determined.

*Id.* at 20.

The Secretary responds that the opening paragraph of § 784.20 always has required an applicant for an underground coal mining permit to survey the area where mining is planned to see if subsidence would cause harm. In the Secretary's view, this survey makes redundant the presubsidence survey that the former subsection (d) required. The Secretary argues that the amount of harm caused by subsidence can be measured by comparing the conditions found in the first survey with those existing when mining is finished. "The difference between the premining and postmining condition of the land is the degree and extent of subsidence damage. This diminution represents the amount of damage for which an operator is responsible." Mem. of Federal Defts in Supp. of Cross Motion for Summary Judgment and in Opp. to Pltfs' Motion for Summary Judgment at 19. "The purpose of the Secretary's rule has always been to [e]nsure that adequate information will be available to 'prove the damage' caused by subsidence when there is a duty to repair or compensate. The Secretary's new rule takes a rational approach to accomplish that purpose." *Id.* at 21.

The Court must agree. First, SMCRA does not specifically require a subsidence control plan. The Act only requires that underground coal miners "adopt measures ... to prevent subsidence causing material damage ... and maintain the value and reasonably foreseeable use of such surface lands...." 30 U.S.C.A. § 1266. A subsidence control plan is a wholly administrative invention, one that this Court has upheld as well-suited to the ends of the Act. As the plan is an idea that the Secretary devised to achieve the act's goals, but not something mentioned in the act, the plan's contents are peculiarly within the Secretary's discretion.

Second, it must be remembered that the parties are not disputing whether underground miners have duties to prevent, to measure, or to remedy subsidence or its harms. The parties are disputing what should be in a *plan* that describes how to accomplish certain duties. Furthermore, the parties are not even disputing how to plan to meet the substantive duties of preventing or to remedying harm. They are arguing about how to plan to measure, which is a procedural task to aid in doing a substantive duty, but not the substantive duty itself. Bureaucrats and their policy analyst counterparts in the quasi-private sector may disagree over plans for procedures. But in this instance, what should be included in the procedural part of the plan is a matter for the Secretary's sound discretion.

Third, the Secretary states that the operator must still, in fact, measure the harm and remedy it. This requirement is part of the performance standards that operators must meet. As the Secretary notes, measuring harm is implicit in the duty to remedy harm contained in the performance standard stated at 30 C.F.R. § 817.121(c). Nothing that NWF has brought to the Court's attention shows that the combination of the initial survey and any monitoring needed is not enough to measure damage from subsidence. Much less has NWF shown the court that the failure to require *in the plan* more than the initial survey and monitoring will prevent an operator from being able to measure harm.

On this issue, the Court can find no fault in the Secretary's exercise of his discretion that warrants overturning the new rule. The Secretary has described how to accomplish the procedural task of measuring harm from subsidence under the revised rule. He also has said that the task must be performed. Further, the rule grants the power to require an underground miner to submit more information when needed. Last, the Secretary has justified the change, stating that the former requirement is redundant and puts an extra burden on operators. SMCRA recognizes that it is "essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry[.]" 30 U.S.C.A. § 1201(b). Eliminating an unnecessary burden on underground coal miners meets this goal.

In essence, NWF contends that SMCRA requires an underground miner to perform one survey to see if a subsidence control plan is needed, and then to conduct a second survey to write the plan itself. To this end, NWF asks the Court to rule that unless § 784.20(d) mandates this second survey, the Secretary has acted irrationally or arbitrarily. The Court cannot agree and must uphold the Secretary's action on this issue.[22]

### C. 30 C.F.R. § 817.121(a), *planned subsidence.*

■ The third issue before the court arises in an unusual posture. NWF challenges not so much a particular rule, but an explanation or interpretation of a rule. The explanation appeared in a footnote in one of the Secretary's briefs on the first issue above, the duty to restore subsidence damage to structures. This challenge must be dismissed as not properly before the court.

### 1.

The rule in question is 30 C.F.R. 817.-121(a). It states:

> The operator shall either adopt measures consistent with known technology which prevent subsidence from causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of surface lands; or adopt mining technology which provides for planned subsidence in a predictable and controlled manner. Nothing in this part shall be construed to prohibit the standard method of room-and-pillar mining.

A footnote in the government's brief filed August 8, 1988, states:

> [I]n most cases an operator is required to prevent material damage to the extent technologically and economically feasible.... [T]his does not mean that an operator has an absolute duty to prevent material damage.... [§ 817.121(a)] requires an operator to *either* 1) adopt measures to prevent subsidence from causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of surface lands; *or* 2) adopt mining technology which provides for planned subsidence in a predictable and controlled manner. (Emphasis added.) Thus operators engaging in planned subsidence are not required to prevent subsidence and other operators are only required to prevent subsidence from caus-

---

**22.** This Court previously has stated that the issues of an underground operator's duty to correct subsidence damage to structures under § 817.121(c) and the contents of the subsidence control plan under § 784.20(d) were "inextricably linked." *PSMRL II, Round II,* Mem. Op. at 14, 21 Env't Rep. Cas. at 1731–32. The Court recognizes that it has ruled in favor of NWF on the duty to correct damage to structures and in favor of the Secretary on the content of the subsidence control plan. The latest round of pleadings and the record in this case have led the Court to unlink the two issues. The Court now finds that the duty to correct damage to structures does not mean an operator must always conduct a second presubsidence survey, however useful it might be in certain cases. Further, under § 784.20(h) an underground operator may be required to provide additional information to show that it will meet the performance standard at 817.121(c) for correcting damage from subsidence. This should enable the regulatory authority to ensure that the operator will be able to measure damage if this is in doubt.

ing material damage to the extent technologically and economically feasible.

Mem. of Federal Defts in Supp. of Cross-Motion for Summary Judgment at 2, n. 1.

According to NWF, in this footnote the Secretary "radically altered his view of subsidence regulation in the United States generally, and his construction of 30 C.F.R. 817.121(a) specifically." Pltfs' Mem. in Opp. to Motion to Dismiss and in Supp. of Motion for Summary Judgment at 15. NWF further argues that the Secretary has adopted the view that the rule and its counterpart in the Act, § 516(b)(1) allows "coal operators who use planned subsidence methods to cause material damage to the natural land surface and to structures even where it is economically and technologically feasible to prevent such damage, and that no duty exists to maintain the value and use of the land when planned subsidence occurs." NWF contends that this position is contrary to the statute, the text of the regulation, and the Secretary's statements in the preamble to this version of the rule when promulgated in 1983.[23]

In response, the government has moved to dismiss the challenge as barred by SMCRA § 526(a)(1), 20 U.S.C.A. 1276(a)(1). That section states that a petition for review of "any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action, or after such date if the petition is based solely on grounds arising after the sixtieth day." The government and industry also advance substantive arguments in opposition to NWF's challenge.

2.

In the court's view this matter is not properly before it. The Secretary has taken no official action since publishing 30 C.F.R. § 817.121(a). Instead, his counsel

has offered a footnote stating an interpretation of the regulation. If the Secretary agrees with his counsel's interpretation of the regulation as expressed in the footnote, then the Secretary may act upon it in a specific instance. At that time, NWF or some other aggrieved entity may properly challenge the action in court as inconsistent with the statute or the regulation. If the Secretary wishes to adopt his counsel's interpretation, then the Secretary may publish it as a proposed rule or notice. That, too, would be an appropriate time for NWF or its allies to make any challenge they feel warranted in law.

However, this court has jurisdiction only over "[a]ny action by the Secretary promulgating national rules or regulations including standards pursuant to ... [§ 516 of the Act, 30 U.S.C.A. 1266]." A footnote is not a national rule or regulation, nor a standard under § 516. In this court's view, it has no jurisdiction to adjudicate a disagreement about an unofficial interpretation of a regulation. This is the more so when the regulation has been promulgated and in the public eye for five years before the footnote interpreting it was written. There is no case or controversy concerning an actual regulation before the court, and the court cannot act as if there were merely because the parties would like it to. As a result, the court will dismiss this portion of the case as unsuited for review. In this regard, the court makes clear that it is not dismissing the matter as barred by time, but as not within the class of actions subject to judicial review under the Act.[24]

III. Effective Date Issues

NWF's next two challenges, the fourth and fifth issues before the Court, raise questions about the Secretary's authority to prescribe by regulation when the Act's

23. The Secretary proposed a revised version of § 817.121(a) at 47 *Fed.Reg.* 16604 (Apr. 16, 1982) as part of his effort to place all of the requirements for subsidence control in a single regulation, 30 C.F.R. § 817.121. This is discussed above in the section dealing with NWF's first challenge. The Final Rule appeared at 48 *Fed.Reg.* 24638 (June 1, 1983). In neither instance did the Secretary propose substantive

changes from the previous version of the rule published in 1979.

24. Although NWF's arguments concerning the merits of the dispute appear compelling, the court explicitly avoids making any finding or ruling on whether the footnote correctly interprets the act or the regulation it purports to explain.

requirements begin to apply to certain kinds of surface coal mining operations.

### D. 30 C.F.R. § 827.13, *Off-site processing operations.*

■ NWF challenges the Secretary's decision to make a definition effective only from the date that this court struck down the definition's predecessor. The court agrees with plaintiffs that this is contrary to the Act and directs that the definition be made effective from the date SMCRA was enacted into law.

### 1.

This issue arises from this Court's July 6, 1984, decision invalidating the 1983 definitions of "coal preparation or coal processing" and "coal preparation plant" at 30 C.F.R. § 701.5 *PSMRL II, Round I*, Mem. Op. at 15–18, 21 Env't Rep. Cas. at 1199–1201. The Secretary's definitions attempted to interpret the Act's language at § 701(28), 30 U.S.C.A. 1291(28). This section is itself a definition of "surface coal mining operations" that are subject to the Act's program of permitting, performance standards, and reclamation. The Secretary's 1983 definitions of coal preparation or coal processing and coal preparation plant excluded from the Act's coverage those activities that processed coal without separating it from impurities and that did not take place at a mine site.[25] The court found that the definitions were "based upon a misreading of the statute. The resulting limitation of the Act's coverage and the Secretary's jurisdiction over ... physical processing ... when these operations do not involve the separation of coal from its impurities, to situations where these operations are conducted in situ is contrary to the statute and cannot stand." *Id.*, Mem. Op. at 19–20, 21 Env't Rep. Cas. at 1201.

In response to the court's decision, the Secretary duly amended the definitions in question to include such activities as off-site coal crushing, screening, and sizing. 30 C.F.R. § 701.5 (1988), published at 50 *Fed.Reg.* 28180 (July 10, 1985). The Secretary also amended the rule at 30 § C.F.R. § 827.13 to require "persons operating coal preparation plants not subject to this chapter before July 6, 1984 [the date of this court's opinion rejecting the Secretary's 1983 definitions], shall comply with the interim or permanent program performance standards...." 30 C.F.R. § 817.13 (1986). These rules were made final at 52 *Fed.Reg.* 17724 (May 11, 1987).

NWF contends that this rule improperly "limited the applicability of this Court's decision to coal crushing, screening and other physical preparation activities which were in operation after the date of this Court's decision ..., rather than those which operated after the effective date of the Act itself." Pltfs' Mem. in Supp. at 36. According to NWF, the effect of this is to exempt "hundreds of sites from the jurisdictional scope of the statute in flat contradiction of the prior decision of this Court and the intent of Congress." *Id.* at 36–37. Therefore, NWF asks the Court to strike down the Secretary's rule applying the *PSMRL II, Round I*, decision only from its date of issue and to direct the Secretary to make the definitions apply from the effective date of the Act. The court finds that its decision dealt with the Secretary's jurisdiction as set by Congress, which the Secretary has no authority to limit. Therefore, the Secretary's rule improperly abridges the scope of the Act. Further, the court finds that the Secretary has failed to state permissible reasons for the rule's provisions implementing the statute. As a result, the court must remand the rule and direct the Secretary to revise it.

### 2.

In publishing the preamble to the Final Rule implementing the *PSMRL II, Round I*, decision on off-site preparation facilities, the Secretary stated that he had

> considered applying the rule retroactively to facilities which ceased operating before July 6, 1984. [The Secretary] has concluded that doing so would not fur-

---

**25.** Among the activities that this definition excluded from the Act's coverage were off-site coal crushing, screening, and sizing operations.

ther public policy in light of the nature both of the [Act] and its application prior to the District Court decision. See *Linkletter v. Walker*, 381 U.S. 618, 627 [85 S.Ct. 1731, 1736, 14 L.Ed.2d 601] (1964[5] ). From an environmental standpoint, the question of retroactivity relates solely to the reclamation of non-waste generating facilities which ceased operating prior to July 6, 1984. Generally, such reclamation would involve the removal of abandoned structures that are not currently causing large amounts of pollution.

52 *Fed.Reg.* 17724, 17728 (May 11, 1987).

The Secretary also justified the decision to limit the effect of this court's ruling to its release date on the ground that before the decision "jurisdiction over such facilities was unresolved and a matter in dispute." *Id.* According to the Secretary, from 1979 when the first definitions of coal processing were published, until 1983, when the Secretary clarified that off-site crushing, sizing, and screening were not subject to the Act, "A reader could have concluded that crushing or screening operations away from the mine site were not surface coal mining operations because they were not processing." *Id.* As result, the Secretary decided that:

> [b]ased upon this regulatory history, . . . although [the Secretary] has jurisdiction to cover facilities operating prior to July 6, 1984, it would be inequitable to do so. Prior to the district court opinion, operators of such facilities could have believed that the program did not apply to them during their period of operation and they could have made business decisions in reliance on those beliefs. In addition, retroactive application of the rule to facilities that ceased operations prior to July 6, 1984, would require regulatory authorities to locate all such facilities, find the persons responsible for the operations of such facilities, and attempt to compel reclamation at those sites. Requiring such efforts in the face of the settled expectation of persons who had

concluded their operations is not warranted in this instance. *Id.*

### 3.

At the outset, it must recalled that the Secretary concedes his jurisdiction over the facilities in question. The court is unaware of any provision in the statute that would permit the Secretary to decline to exercise it, nor has the Secretary brought any such provision to the court's attention. As Congress stated in passing SMCRA, it intended to "implement a national system of coal mining regulation, by—covering all coal surface mining . . . and the surface impacts from underground mining and *coal processing*[.]" H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 57, *reprinted in 1977 U.S. Code Cong. & Admin.News*, 593, 595 (emphasis added). The Secretary is required to give effect to this intention as stated in the Act. He may not decline to exercise authority over activities that the statute defines as surface coal mining operations, particularly coal processing. In this case, the Secretary is not dealing with a matter within his sound discretion, where he might choose to fill in administrative gaps that Congress left in the law. Congress stated in § 701(28) that coal processing and preparation are surface mining operations subject to the Act. Congress has said that such operations must be reclaimed. This court has reversed the Secretary's failure to regulate as Congress intended when he improperly defined coal preparation and processing. Now the Secretary attempts to circumvent the clear thrust of these decisions and to avoid requiring that certain such coal processing activities be reclaimed. That action clearly is contrary to SMCRA and cannot stand.

Additionally, the Secretary's reasons for declining to exercise jurisdiction are wholly unpersuasive. These reasons are that exercising jurisdiction is retroactive regulation and is inequitable. As support, in the preamble to the 1987 regulations, the government cites *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). This citation defines dubious authority. *Linkletter* is a habeas corpus

case. It decided that the application of the Fourth Amendment exclusionary rule to the states, as announced in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), could not be used as a basis for collateral attack on criminal convictions that became final on direct appeal before the Supreme Court decided *Mapp. Linkletter* is of little use to this court. First, it is a criminal case. Second, it refused to apply *Mapp* only on collateral attack, something in no way similar to this case. Third, *Linkletter* refused to apply *Mapp* because the exclusionary rule is a judicially created device to remedy police illegality, and thus is not stated in the language of the Fourth Amendment. As such, *Linkletter* has no application to a civil case where the Secretary misread the language of the governing statute and wrongly decided not to regulate activities within the statute's scope. Fourth, to the extent that *Linkletter* provides the court with guidance, the Secretary cites it for the proposition that a decision about the retroactive effect of a change in law should be based upon "public policy in the light of the nature both of the statute and of its previous application." *Linkletter*, 381 U.S. at 627, 85 S.Ct. at 1736 (quoting *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329 (1940)). In this instance, SMCRA's public policy is to ensure reclamation, while the effect of the Secretary's challenged rule is to exempt certain abandoned facilities from reclamation, thus hindering the policy. Further, as discussed below, before the Secretary's invalid 1983 definition, the statute's previous application was in the direction of making explicit what had been implied, that is, that off-site processing was covered by the Act, not exempted. Thus the Secretary's citation to *Linkletter* is unavailing. If anything, it supports NWF's position.

In their briefs, the government and industry also rely on *Georgetown University Hospital v. Bowen*, 821 F.2d 750 (D.C.Cir. 1987). In *Georgetown*, the court ruled that

the Secretary of Health, Education, and Welfare could not effectively make retroactive a rule whose predecessor had earlier been struck down for failure to provide notice and comment. *Id.* at 753. That is not what NWF seeks here. Rather, NWF asks the court to give effect to the correct definition of surface coal mining operations from the time Congress intended these operations to be regulated—the effective date of the Act. On the other hand, the real result of what the Secretary has done is to give his improper 1983 decision retroactive effect back to 1979.

Further, the Secretary's argument is not much better supported by the facts than it is by the law.[26] As NWF points out, and the Secretary tacitly admits, the Secretary's 1983 definition was only in effect from May 1983 through June 1984. Before that, it was at the very best unclear *under the Secretary's earlier rules* whether the Act covered off-site facilities that processed but did not purify coal. In 1984, the court made it clear that the Act does.

Given the statute's language and the Secretary's original permanent rules, reasonable operators should have been on notice that such off-site physical processing facilities might be regulated. Indeed, the reasonable operator should have been aware that such facilities likely would be regulated. Since 1979, the Secretary has made clear that "coal processing plants no matter where located" would be regulated. 44 *Fed.Reg.* 15095 (1979). True, the 1979 definition of coal processing did include separating impurities. But, as the Secretary admits, the 1979 preamble to the final definition of "surface coal mining operations" stated that it was unnecessary to add the phrase "crushing and screening" to the definition of surface coal mining operations. This was because both the proposed and final definition included terms readily interpreted to cover such activities. 52 *Fed.Reg.* 17724, quoting 44 *Fed.Reg.* 14914 (1979). Additionally, in June 1980, the Sec-

**26.** The court also considers the Secretary's other cases unpersuasive. Although they stand for the view that certain kinds of rules should not be applied retroactively, none deal with the failure to regulate an activity by improperly defining what that activity includes. *See United States v. Shelton Coal Corp.*, 829 F.2d 1336 (4th Cir.1987).

retary proposed to amend the definition of coal processing plants to make explicit that the Act covered activities such as crushing and screening that did not separate coal from its impurities. 45 *Fed.Reg.* 42335 (1980). Although these rules never became final, the very fact that they were designed to make explicit what the Secretary already believed to be the case militates against settled expectation or reliance. In any event, before 1983, at most the only expectations that could have become settled were those based upon the view that the definition of surface coal mining operations was readily interpreted to include crushing and screening. In the court's view, there is no equity in relying on a position not justified by the statute, particularly when the position can only be relied on by ignoring signs that this position is contradicted in rules interpreting the statute.

Last, the court cannot agree that requiring regulatory authorities to take difficult steps to compel operators to reclaim is unwarranted when the operators had settled expectations otherwise. The court already has rejected the view that operators could or should have had settled expectations. Thus the Secretary's argument boils down to: difficulty in enforcing the law is a good reason not to. Such a view ill becomes the Executive Branch, and it is not one that the Judicial Branch may adopt. To the extent that the argument has any validity at all as a practical contention, it is one that should be made to Congress. Moreover, the preamble to this rule is devoid of anything that shows how difficult it would be for "regulatory authorities to locate all such facilities, find the persons responsible for the operations of such facilities, and attempt to compel reclamation at those

sites." The court is not persuaded by a weak argument with no more foundation than a conclusory statement.

In sum, the court finds that the Secretary must give effect to this court's *PSMRL II, Round I,* decision on off-site processing facilities from the effective date of the Act. The Secretary may not avoid the jurisdiction Congress gave him.

### E. 30 C.F.R. § 701.5, *Previously mined area.*

■ NWF's final challenge is to the Secretary's rule defining "previously mined area" at 30 C.F.R. § 701.5. An operator remining a previously mined area need not reclaim it as fully as a site mined for the first time. The parties dispute whether "previously" means before the date Congress passed the Act or before the dates that the Act's substantive requirements began to apply to a specific mining operation or site. Finding that a definition using the date of SMCRA's enactment more closely conforms to the Act and this court's earlier ruling on this issue, the court must uphold NWF's challenge and remand the rule.

### 1.

As part of the Secretary's overhaul of SMCRA regulations in 1983, he revised the rules for remining operations. In particular, he relieved an operator remining a previously mined area from having to eliminate all preexisting highwalls completely.[27] 30 C.F.R. §§ 816.106, 817.106, 819.11(b), 819.13(c), and 819.19(b) (1983). If the operator is working a new site, it must reclaim it by backfilling all highwalls to eliminate them completely. The land then must usually be graded or restored to roughly its shape or contour before mining.[28] At

---

**27.** Although preexisting highwall is not defined, it may be regarded as a highwall that is at a site before remining begins. Usually this happens when an earlier highwall was not reclaimed because SMCRA did not apply to the first operation. Highwalls occur after coal has been scooped out of the ground. They represent the vertical edge of the area not mined, and tend to resemble a steep cliff or drop-off. Congress has defined a highwall to be "a more or less vertical bank marking the inner limit" of the flat area of a hillside from which coal has been removed. H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 77,

*reprinted in 1977 U.S.Code Cong. & Admin.News* 593, 615. Highwalls pose a threat of collapse and landslide. SMCRA § 515(b)(3) 30 U.S.C.A. § 1265(b)(3), generally requires an operator to remove all highwalls when reclaiming a site.

**28.** This is referred to in the Act as "approximate original contour" ("AOC"). This AOC requirement is found in § 515(b)(3), 30 U.S.C.A. § 1265(b)(3), of the Act, which also contains certain exceptions, as does § 515(c), 30 U.S.C.A. § 1265(c).

previously mined sites, however, when there is not enough reasonably available spoil to backfill and eliminate completely a preexisting highwall that has been enlarged or remined, the operator need only eliminate the highwall to the "maximum extent technically practical." [29] 30 C.F.R. §§ 816.106(b) and 817.106(b) (1988). Thus, the operator may leave part of a preexisting highwall standing, provided it is stable. The remined site also need only be graded to a slope that matches the land's approved use after mining, but the slope must have "adequate drainage and long-term stability."

The Secretary based his decision on the belief that if preexisting highwalls are to be reclaimed it will only be through remining. "If the operators must totally eliminate preexisting highwalls even where there is insufficient spoil then they might have no economic incentive to remine and do any reclamation. The old minesites would be abandoned without any of the safety standards of the Act being met." *PSMRL II, Round I,* Mem. Op. at 27–28, 21 Env't Rep. Cas. at 1204. NWF challenged the rule on the ground that the Act required that all highwalls be eliminated. In *PSMRL II, Round I,* Mem. Op. at 25–29, 21 Env't Rep. Cas. at 1203–04, the court upheld the Secretary's general authority to let operators leave standing the stable remnants of *preexisting* highwalls at previously mined sites.[30] The court ruled that SMCRA contains no clear expression of an intent that preexisting highwalls be eliminated. *Id.* at 1204. Although the Act's language directs that all highwalls must be eliminated, it is prospective. *Id.* at 1205. The court contrasted this with the Act's language on coal waste piles which states that all "existing and new" piles are subject to the Act's requirements. *Id.* at 1204.

This left open the question of how to define previously mined area. The 1983 definition stated that a previously mined area was "land disturbed or affected by earlier coal mining operations that was not reclaimed in accordance with the requirements of this chapter." 30 C.F.R. 701.5 (1984), published in 48 *Fed.Reg.* 41734 (1983). NWF challenged this, too, and the court rejected it as too broad. *PSMRL II, Round III,* 620 F.Supp. at 1572–74.

The court stated that the logic of the earlier *Round I* opinion, "and the fact that the court approved what it then called a limited exception to the highwall elimination requirement suggests that the [1983 definition] in permitting exceptions to highwall elimination in situations where land is left unreclaimed after the Act's effective date goes beyond what is permitted by the Act." *Id.* at 1572. The court added that its *Round I* opinion "had necessarily concluded that the word 'existing' referred to . . . existence prior to the Act's passage. Thus the court permitted a narrow exception to highwall elimination for highwalls existing prior to the passage of the Act." *Id.* The court made three other points about the statutory language requiring that all highwalls be eliminated: (1) the Act sets forth what it describes as "minimum" standards, which suggests a floor below which the Secretary may not go; (2) the Act plainly calls for elimination of *all* highwalls; and, (3) the section stating that all highwalls be eliminated refers to possible exceptions, which suggests that Congress had considered and provided for any exceptions, so no others should be permitted. *Id.* at 1573. As a result, the court remanded the 1983 definition to be revised.

In response, the Secretary published a new definition at 51 *Fed.Reg.* 27508 (July

---

**29.** Spoil is the dirt, rock, and other material between the topsoil and the coal deposit. It is removed when the coal is mined.

**30.** Specifically, the court rejected NWF's challenge to rules at 30 C.F.R. Part 819 letting an auger mining operator reauger a previously mined area without requiring that the operator completely backfill the highwall. Auger mining is a method of mining coal at a highwall by

drilling holes into an exposed seam of coal from the highwall and then moving the coal along the auger bit back to the surface. *PSMRL II, Round I,* Mem. Op. at 25, 21 Env't Rep. Cas. at 1203 (quoting 30 C.F.R. § 701.5 (1983)). The parties then settled similar challenges to the rules at 30 C.F.R. §§ 816.106 and 817.106, whose provisions on preexisting highwalls at previously mined sites were discussed above.

31, 1986).[31] It defines previously mined area as "land previously mined on which there were no surface coal mining operations subject to the standards of the Act." 30 C.F.R. § 701.5 (1988).

2.

NWF contends that the court's *PSMRL II, Round III* opinion stands for the proposition that previously mined area means land that had been mined before Congress passed the Act.[32] Therefore, NWF argues that the Secretary's definition of previously mined area is invalid because it concededly includes land mined after the date of the Act's passage. NWF asks the court to define previously mined as mined before a specific point in time, and that point is the day the Act became the law of the land.

In response, the Secretary argues that he has cured the new definition of the defect that the court earlier considered fatal. In essence, he contends that the Act has several effective dates, depending upon the kind of coal mine considered. These effective dates are those on which the operator working a mine had to begin to comply with the substantive terms of SMCRA. The Secretary argues that his regulation complies with the court's previous decision by using these various effective dates to define previously mined area. "Congress provided for a transition period for surface coal mining operations with compliance dates well after the enactment date of SMCRA." Federal Defts' Mem. in Supp. of Cross–Motion for Summary Judgment and in Opp. to Pltfs' Motion for Summary Judgment at 54. According to the government:

> mining operations in existence in August or September of 1977 [after SMCRA's enactment] were given until May 1978 within which to comply with the interim

program performance standards.... Rather than comply, however, these operations could have ceased doing business. Since these operations ceased doing business before the statutory compliance date, they were never subject to the Act's standard....

[Additionally, SMCRA § 528, 30 U.S.C.A. § 1278] specifically exempts three classes of coal mining operations from all of the standards of the Act: 1) the extraction by a landowner for his own use, 2) the extraction of coal for commercial purposes from sites that affect two acres or less, and 3) the removal of coal from a government-financed highway or other construction projects.

Third, [SMCRA] contains an exemption for small operators [whose total annual tonnage did not exceed 100,000 tons] for all standards of the Act until January 1, 1979. Since Congress chose to exempt certain operations from SMCRA's requirements, the Secretary's decision to use the effective date of the Act's substantive requirements rather than the enactment date of SMCRA is reasonable and avoids the problems associated with the retroactive application of the Act.[33]

*Id.* at 54–55.

Additionally, the Secretary renews an argument offered to support the 1983 definition of previously mined areas: the rule will encourage more sites to be reclaimed. Thus, the rule promotes the primary policy behind SMCRA, which is to encourage reclamation. According to the Secretary, the sites in question are all places where the mining that occurred was exempt from the Act's requirements, even though it happened after the Act was passed. In other words, the Act does not require the exempted operator to do any reclamation. Only a remining operation will have to re-

---

**31.** The final definition was published at 52 *Fed. Reg.* 17526 (May 8, 1987).

**32.** For this issue, previously mined also must mean that mining had ceased. This is so whichever definition is accepted. NWF contends that any mining that took place after SMCRA became law would come under the Act's requirements and would have had to be reclaimed. The Secretary argues that exempted mining that

had not stopped would still be exempted and thus not yet subject to SMCRA.

**33.** This argument about retroactive effect of the Act is not really pursued further. The court assumes that the Secretary meant retroactive effect of the Act's substantive requirements rather than the Act, because on this issue nobody is discussing applying the Act before the date of enactment.

claim. Thus the real choice, the Secretary argues, is between no reclamation and part reclamation, the latter obviously being better than nothing. When there is not enough spoil available to eliminate preexisting highwalls completely, full reclamation will be so burdensome that no operator will remine the site. Therefore, according to the Secretary, operators must be given a break or the exempt site will not be reclaimed at all.

### 3a.

■ Before analyzing the parties' arguments, the court must state that it will have to remand the Secretary's definition regardless of whether it decides in favor of the Secretary or NWF. When the Secretary proposed the current definition, the Commonwealth of Kentucky commented that the definition lets an operator remine an area that had been *fully and satisfactorily reclaimed* and then leave it only *partly reclaimed.* Administrative Record at 10. In the preamble to the Final Rule, the Secretary conceded this was "possible but unlikely." 52 *Fed.Reg.* 17526 (1987). The Secretary then gave various technical reasons why this probably would not happen.[34] Improbability is not enough. A definition cannot stand that lets full reclamation be undone for a later partial effort. The definition must be rewritten to make this impossible.

### b.

As used here, "previously mined" is entirely a creature of the Secretary. The term "previously mined" is used only once in the Act, in a section altogether unrelated to the issue now before the court. SMCRA § 502(a), 30 U.S.C.A. § 1252(a) ("No person shall open or develop any new or previously mined or abandoned site for surface coal mining operations ... unless such person has obtained a permit...."). While the Secretary's definition cannot be compared to any statutory language, it may be analyzed for its consequences for Congress' goals as stated in the statute. When this is done, it is obvious that the definition is

contrary to the Act. To a large extent, the court's opinions in *PSMRL II, Round I,* and *PSMRL II, Round III,* compel this conclusion.

In *PSMRL II, Round I,* this court approved a limited exception to the requirement that all highwalls be eliminated. In doing so, the court recognized that the Secretary's scheme had as its object encouraging reclamation that would not otherwise occur, as well as stimulating additional coal production. Both of these are explicit goals of the Act. But the *Round I* opinion specifically spoke only of preexisting highwalls. The context of the discussion of this limited exception in *Round I* strongly suggested that preexisting means existing before the effective date of the Act. The *Round III* opinion made plain that if the exception leaves unreclaimed a site mined after the Act's effective *date,* then the exception goes beyond the Act. The court later stated that the narrow exception is for highwalls existing before the passage of the Act.

As NWF points out, for the Secretary's argument to hold true, the court would had to have spoken of effective *dates.* Indeed, there is more than one date that the Act's substantive requirements first take effect. But the Act's effective date and the date one or more of its requirements take effect are two different things. The court spoke of the effective date of the *Act,* and this must be the date it was enacted into law. That date is when surface coal mining operations in the U.S. became subject to a new law.

When enacted, SMCRA applied to all and any such operations, including the operations partly or fully exempted. What the Secretary's argument fails to capture is that the exempt site is not exempt by its inherent nature. It is exempt because Congress made it so. Congress could have chosen any of a number of other, slightly different, or fewer exemptions. All mining operations, exempt and covered, gained such status as a result of the passage of the Act. The date of enactment must be

---

**34.** The Secretary responded "[i]f a State regulatory authority is concerned that this situation may occur, then it may develop a stricter definition of previously mined area to prevent it."

the time from which the temporal concepts of "preexisting" and "previous" are measured.

Moreover, the court's three *Round III* statements about why Congress intended no additional exceptions to the highwall elimination requirement remain true. The Secretary has offered nothing to suggest why § 515(b)(3) is not a "floor below which [he] is not empowered to go in setting less demanding standards." *PSMRL II, Round III*, 620 F.Supp. at 1573. Nor has he overcome the language referring to "all" highwalls or dealt with why the exceptions stated in § 515(b)(3) do not preclude others. Further, this court must still be guided by the statement in the legislative history that "the elimination of highwalls ... [is] among the standards critical to the elimination of the worst effects of coal surface mining." H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 85, *reprinted in 1977 U.S. Code Cong. & Admin.News*, 593, 621.

Against this, the Secretary can array only his practical argument that his definition encourages remining and through it reclamation that would not otherwise occur. In *Round III*, the court found no support for this view in the Administrative Record. Now, the Commonwealth of Virginia's comments do provide the Secretary some support. Administrative Record at 7.[35] But the court finds this is largely cancelled out by the other commenters, notably the Commonwealth of Kentucky, who dwelt at length at "the potential for widespread abuse" in the definition.[36] More important, given the statute's language, a practical argument on this issue is properly made to Congress rather than the court.

For these reasons, the court must sustain plaintiffs' challenge. It will remand

the definition of previously mined area to the Secretary to correct both flaws identified above.

## IV.

In conclusion, the court makes the following rulings: (1) the Secretary's limitation to the duty to correct subsidence damage to structures based upon applicable state law is contrary to the Act, and plaintiffs' motion for summary judgment on this issue will granted to plaintiffs in that 30 C.F.R. § 817.121(c)(2) (1988) will be remanded to the Secretary to eliminate this limitation; (2) the Secretary's requirements for a subsidence control plan at 30 C.F.R. § 784.20(d) (1988) are not contrary to the Act, and defendants' motion for summary judgment on this issue will be granted; (3) this court has no jurisdiction over plaintiffs' challenge to 30 C.F.R. § 817.121(a) (1988), and the challenge will be dismissed; (4) the application only from July 6, 1984, of the ruling that off-site coal preparation and processing are surface coal mining operations is contrary to the Act, and plaintiffs' motion for summary judgment on this issue will be granted in that 30 C.F.R. § 827.13 will be remanded to the Secretary to be revised; and, (5) the Secretary's definition of previously mined area at 30 C.F.R. § 701.5 is contrary to the Act, and plaintiffs' motion for summary judgment on this issue will be granted in that 30 C.F.R. § 701.5 will be remanded to the Secretary to be revised.

---

**35.** Nevertheless, the thrust of the Commonwealth's argument is that the definition should make clear that previously mined areas will only be given partial relief if they *"would not otherwise* be reclaimed." Administrative Record at 7 (emphasis in original). "This limitation would seem to appropriately limit the definition, thus curing the defects of the remanded definition, while recognizing the need to encourage the reclamation of all disturbed lands which would not otherwise be reclaimed." *Id.* The Secretary's current definition thus does

not meet the claims made of it, that is, that it efficiently promotes reclamation through remining.

**36.** In its brief, NWF suggests that 7,000 sites are subject to possible exemptions that would qualify under the current definition of previously mined. Pltfs' Mem. in Supp. at 56. It would have the court believe that many of these claimed exemptions are bogus and could be abused under the Secretary's definition.