OLD BEN COAL COMPANY, Plaintiff-Appellant, v. THE DEPARTMENT OF MINES AND MINERALS, Defendant-Appellee.

Fifth District No. 5—89—0353

Opinion filed November 1, 1990.

Terry R. Black, of Campbell, Black, Carnine & Heden, of Mt. Vernon, and Jeffrey C. Conrad, of Cleveland, Ohio, for appellant.

Neil F. Hartigan, Attorney General, and Pfeifer & Kelty, P.C., both of Springfield (Robert J. Ruiz, Solicitor General, of Chicago, and Robert E. Wagner, Special Assistant Attorney General, of Springfield, of counsel), for appellee.

JUSTICE RARICK delivered the opinion of the court:

On May 23, 1988, plaintiff, Old Ben Coal Company, filed this action in the circuit court of Franklin County seeking administrative review of a decision of the Illinois Department of Mines and Minerals (IDMM). Old Ben sought to vacate conditions contained in four Permanent Coal Mining Reclamation Program Permits issued by the IDMM requiring Old Ben to repair or restore structures damaged by subsidence. The circuit court affirmed the decision of the IDMM and this appeal followed.

On appeal, Old Ben argues that the IDMM has no authority under the Illinois Surface Coal Mining Land Conservation and Reclamation Act (Illinois Act) (Ill. Rev. Stat. 1981, ch. 96½, par. 7901.01

*et seq.*) to require the repair or restoration of structures damaged by subsidence because the Illinois Act authorizes only those standards which comply with the Federal Surface Mining Control and Reclamation Act of 1977 (Federal Act) (30 U.S.C. §1201 *et seq.* (1988)), and the Federal Act does not require the repair or restoration of structures damaged by subsidence. Further, Old Ben argues section 1.02(c) of the Illinois Act (Ill. Rev. Stat. 1981, ch. 96½, par. 7901.02(c)) specifically prohibits any requirements more stringent than the Federal Act and therefore prohibits any regulation requiring the repair or restoration of structures damaged by subsidence because such a regulation would place a greater burden on the coal operator than the Federal Act does.

A brief history of the State and Federal laws on this subject is a necessary prelude to the analysis of Old Ben's arguments. In 1977, Congress enacted the Surface Mining Control and Reclamation Act (Federal Act) (30 U.S.C. §1201 *et seq.* (1988)), the purpose of which was to regulate all coal mining in the United States. The Federal Act also created the Office of Surface Mining Reclamation and Enforcement (OSMRE), which was charged with promulgating Federal Coal Mining Reclamation Program Regulations (Federal regulations). The Federal Act provided that all coal mining in the United States was to be controlled by Federal regulation or, alternatively, by State laws meeting the Federal standards and approved by the OSMRE. (30 U.S.C. §§1251, 1252 (1988).) The Federal regulations promulgated by the OSMRE were adopted in 1979. 30 C.F.R. ch. VII (1979).

The only reference to subsidence contained in the Federal Act is found in section 516(b)(1), which provides:

"Each permit issued under any approved State or Federal program pursuant to this [Act] and relating to underground coal mining shall require the operator to—

(1) adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of such surface lands, except in those instances when the mining technology used requires planned subsidence in a predictable and controlled manner: *Provided*, That nothing in this subsection shall be construed to prohibit the standard method of room and pillar mining." (Emphasis in original.) (30 U.S.C. §1266(b)(1) (1988).)

The Federal regulations, however, specifically required repair or

restoration of structures damaged by subsidence.[1] These regulations were upheld by the Federal district court. *In re Permanent Surface Mining Regulation Litigation* (D.D.C. 1980), 14 Env't Rep. Cas. (BNA) 1083, 1108 (Round I).

In 1980, Illinois adopted the Surface Coal Mining Land Conservation and Reclamation Act (Illinois Act) (Ill. Rev. Stat. 1981, ch. 96½, par. 7901.01 *et seq.*). The Illinois Act authorized the IDMM to promulgate regulations and issue mining permits requiring compliance with the Federal Act and related Federal regulations. Section 4.02 of the Illinois Act, which is virtually identical to section 516(b)(1) of the Federal Act, provides:

> "Each operator shall adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of surface lands, except in those instances where the mining technology used requires planned subsidence in a predictable and controlled manner. Nothing in this Section shall be construed to prohibit the standard method of room and pillar mining." (Ill. Rev. Stat. 1981, ch. 96½, par. 7904.02.)

The State act was conditionally approved by the OSMRE on June 1, 1982 (47 Fed. Reg. 23858 (1982)). In 1982, the IDMM adopted regulations virtually identical to the Federal regulations,

---

[1]The original rule, 30 C.F.R. §817.124 (1979), published at 44 Fed. Reg. 14902 (March 13, 1979), read:

"(a) \* \* \*

(b) Each person who conducts underground mining which results in subsidence that causes material damage or reduces the value or reasonably foreseeable use of the surface lands shall, with respect to each surface area affected by subsidence

(1) Restore, rehabilitate, or remove and replace each damaged structure, feature or value, promptly after the damage is suffered, to the condition it would be in if no subsidence had occurred and restore the land to a condition capable of supporting reasonably foreseeable uses it was capable of supporting before subsidence;

(2) Purchase the damaged structure or feature for its fair market, pre-subsidence value and shall promptly after subsidence occurs, to the extent technologically and economically feasible, restore the land surface to a condition capable and appropriate of supporting the purchased structure, and other foreseeable uses it was capable of supporting before mining \* \* \* or

(3) Each person who conducts underground mining activities will compensate the owner of any surface structure in the full amount of the diminution in value resulting from subsidence." 30 C.F.R. §817.124 (1979).

including the requirement to repair or restore structures damaged by subsidence.[2]

As of 1982, both Federal and State law required the repair or restoration of structures damaged by subsidence.

In 1982, the Secretary of the Interior proposed to amend and combine the rules on subsidence so that 30 C.F.R. §817.121 "would provide all the requirements for subsidence control." (47 Fed. Reg. 16604 (April 16, 1982).) The proposed revised regulation required repair or restoration of both structures and land, as did the existing regulation. (47 Fed. Reg. 16,610 (April 16, 1982).) As finally promulgated, however, the new rule required repair or restoration of subsidence damage to land, but repair or restoration of structures damaged by subsidence was mandated only to the extent required under the ap-

---

[2]Section 1817.124 provides:

"(a) Each person who conducts underground mining activities shall adopt all measures approved by the Department under *** 1784.20 to reduce the likelihood of subsidence, to prevent subsidence causing material damage, or reducing the value, or reasonably foreseeable use of surface lands, and to mitigate the effects of any such damage or reduction which may occur.

(b) Each person who conducts underground mining which results in subsidence that causes material damage or reduces the value or reasonably foreseeable use of the surface lands shall, with respect to each surface area affected by subsidence:

(1) Restore, rehabilitate, or remove and replace each damaged structure, feature or value, promptly after the damage is suffered, to the condition it would be in if no subsidence has occurred and restore the land to a condition capable of supporting reasonably foreseeable uses it was capable of supporting before subsidence; or

(2) Purchase the damaged structure or feature for its fair market, pre-subsidence value and shall promptly after subsidence occurs, to the extent technologically and economically feasible, restore the land surface to a condition capable and appropriate of supporting the purchases [sic] structure, and other foreseeable uses it was capable of supporting before mining. Nothing in this paragraph shall be deemed to grant or authorize an exercise of the power of condemnation or the right of eminent domain by any person engaged in underground mining activities.

(c) Each person who conducts underground mining activities will compensate the owner of any surface structure in the full amount of the diminution in value resulting from subsidence, by purchase prior to mining of noncancellable, premium prepaid insurance policy or other means approved by the Department as assuring before mining begins that payment will occur; indemnify every person with an interest in the surface for all damages suffered as a result of the subsidence; and, to the extent technologically and economically feasible, fully restore the land to a condition capable of maintaining reasonably foreseeable uses which it could support before subsidence." 62 Ill. Adm. Code 1817.124 (1985).

plicable provisions of State law.[3] Both industry and environmentalists challenged the new rules as they related to subsidence damage. The Federal District Court for the District of Columbia upheld the rule against industry's challenge to the requirement to restore land materially damaged by subsidence, but did not reach the merits of the environmentalists' challenge to the limitation on the duty to correct structures damaged by subsidence. Finding that the new final rule represented a "radical change" from the proposed rule and constituted a complete reversal of policy, the court ruled that the parties had not had an adequate opportunity to comment and remanded the rule for proper notice and comment. (*In re Permanent Surface Mining Regulations Litigation* (D.D.C. 1984), 21 Env't Rep. Cas. (BNA) 1724, 1727-32 (Round II).) In response to the remand, OSMRE suspended the portion of the regulation limiting operator responsibility to State law. 50 Fed. Reg. 7274 (February 21, 1985).

A new Final Rule was proposed in 1987. (52 Fed. Reg. 4860 (1987).) The 1987 rule also contained the provision that underground operators need only correct subsidence damage to structures "[t]o the extent required under applicable provisions of State law."[4] (30 C.F.R. §817.121(c)(2) (1988).) The rule was again challenged and the district court for the District of Columbia again struck down the rule, finding that limiting the duty of underground operators to correct subsidence damage to structures based on ap-

---

[3]30 C.F.R. section 817.121(c)(2) (1983) provided:

"(c) The operator shall—

\* \* \*

(2) To the extent required by State law, either correct material damage resulting from subsidence caused to any structures or facilities by repairing the damage or compensate the owner of such structures or facilities in the full amount of the diminution in value resulting from the subsidence. Repair of damage includes rehabilitation, restoration, or replacement of damaged structures or facilities. Compensation may be accomplished by the purchase prior to mining of a noncancellable premium-prepaid insurance policy." 30 C.F.R. §817.121(c)(2) (1983).

[4]"(c) The operator shall—

\* \* \*

(2) To the extent required under applicable provisions of State law, either correct material damage resulting from subsidence caused to any structures or facilities by repairing the damage or compensate the owner of such structures or facilities in the full amount of the diminution in value resulting from the subsidence. Repair of damage includes rehabilitation, restoration, or replacement of damaged structures or facilities. Compensation may be accomplished by the purchase prior to mining of a non-cancellable premium-prepaid insurance policy." 30 C.F.R. §817.121(c)(2) (1988). .

plicable State law was contrary to the Federal Act, and remanded the rule to be revised by striking the reference to State law. (*National Wildlife Federation v. Lujan* (D.D.C. 1990), 733 F. Supp. 419, 429.) The court found that the language of the Federal Act demonstrated that "Congress did not differentiate based upon state law between the duties of underground operators with respect to subsidence damage to land and to structures" and that section 817.121(c)(2) of the Federal regulations was inconsistent with section 102(b) and the first and third clauses of section 516(b)(1) of the Federal Act (30 U.S.C. §§1202(b), 1266(b)(1) (1988)). *Lujan*, 733 F. Supp. at 426.

Having set forth the history of the Federal and State laws in question, we now turn to Old Ben's arguments. Old Ben maintains that there is no authority under section 1.02(b) or any other provision of the Illinois Act for the permit requirements to repair or restore structures damaged by subsidence. Section 1.02(b) of the Illinois Act states that the policies of the Act are to be implemented through methods and standards which comply with the Federal Act.[5] Because the OSMRE deleted the requirement to repair or restore structures damaged by subsidence, Old Ben maintains, the IDMM's requirement to repair or restore such damage no longer complies with the requirements of the Federal Act and so is not authorized by section 1.02(b) of the Illinois Act. Old Ben's position is that regulations requiring repair or restoration of structures damaged by subsidence are not necessary to comply with the Federal Act. Old Ben contends because an agency's authority to promulgate regulations is strictly confined to the enabling statute, the Illinois Act no longer authorizes the IDMM regulations. We are unpersuaded by Old Ben's arguments.

At the time the permits in question were issued, 1986, the Federal regulations, which provided that repair or restoration of structures damaged by subsidence was mandated only to the extent required under State law, had been remanded to the OSMRE, and the original 1979 rules, requiring the repair or restoration of structures damaged by subsidence, were still in force and effect (50 Fed. Reg. 7,274 (Feb. 21, 1985). Therefore repair or restoration of structures

---

[5]Section 1.02(b) provides:
"It is the purpose of [the SCMLCRA] to implement [the policies set forth in section 1.02(a)] through the methods and standards that fully comply with the requirements established by the United States Congress in the Surface Mining Control and Reclamation Act of 1977." Ill. Rev. Stat. 1989, ch. 96½, par. 7901.02(b).

damaged by subsidence was still required regardless of State law. As noted before, in 1987 the OSMRE again promulgated a regulation requiring the repair or restoration of structures damaged by subsidence only to the extent required by applicable State law. Even if this rule had not been struck down by the Federal district court in *Lujan*, we find that because section 817.121(c)(2) deferred to State law on the subject of repair or restoration of structures damaged by subsidence, the IDMM had authority under section 1.02(b) of the Illinois Act to promulgate regulations requiring the same.

■■ Contrary to Old Ben's arguments, when the Secretary amended 30 C.F.R. §817.121(c)(2) in 1983, the requirement to repair or restore structures damaged by subsidence was not deleted, but was thereafter required only to the extent mandated by applicable State law. The same is true of the 1987 amendment. Thus, section 817.121(c)(2) recognized that State law may require repair or restoration of structures damaged by subsidence. The purpose for the change in the rule was to correct perceived inequities created by the 1979 rule which imposed a restoration and repair requirement for structures damaged by subsidence regardless of whether the coal operator had surface support waivers. The rationale behind this was that Congress had not intended to create new property rights, but to protect existing ones. (52 Fed. Reg. 4860 (February 17, 1987).) By deferring to State law in order to allow States to recognize the validity of common law waivers, however, this section also allows States to require repair or restoration. Section 1.02(b) provides for the implementation of the policies set forth in section 1.02(a) through methods which comply with the Federal Act. Because section 817.121(c)(2) recognizes that State law may require repair or restoration of structures damaged by subsidence, the IDMM requirements promulgated under the Illinois Act are in compliance with the Federal Act.

■■ We also note that in rejecting the rule, the district court in *Lujan* held that the language of the Federal Act demonstrated that section 516(b)(1) applied to both land and structures and that no authority existed under the Federal Act for the Secretary of the Interior to permit limitations on the duty to repair or restore structures damaged by subsidence based on applicable State law. (*Lujan*, 733 F. Supp. at 426.) The court found that Congress in section 102(b) of the Federal Act intended to provide protection from and redress for subsidence damage to structures where such protection did not exist under State law. (*Lujan*, 733 F. Supp. at 427.) Under *Lujan*, the

Federal Act itself requires the repair or restoration of structures damaged by subsidence, without regard to State law. Given this interpretation, not only does section 1.02(b) of the Illinois Act authorize the IDMM to require the same, it may well mandate it.

■ Old Ben also argues that section 1.02(c) of the Illinois Act,[6] which provides that requirements under the Illinois Act are to be no more stringent than those required to meet the Federal Act, precludes IDMM regulations requiring the repair or restoration of structures damaged by subsidence. The hearing officer agreed with Old Ben, but found that section 1.02(c) applied only to the Federal Act and the 1979 Federal regulations, but not subsequent changes to the Federal Act or the Federal regulations. The hearing officer ruled that section 1.02(c) did not operate to invalidate Illinois' regulation which became more stringent than the Federal Act because of subsequent changes in the Federal Act or Federal regulations. If section 1.02(c) were construed to operate this way, the hearing officer reasoned, it would constitute an unconstitutional delegation of legislative power. We need not address the merits of the hearing officer's position as we find that because section 817.121(c)(2) defers to State law on the subject, IDMM regulations are not more stringent than the Federal Act. Old Ben relies heavily on *Consolidated Coal Co. v. Department of Mines & Minerals* (1987), 160 Ill. App. 3d 677, 514 N.E.2d 9. In that case we held that section 1.02 of the Illinois Act precludes Illinois from establishing regulations which are more stringent than *comparable* Federal regulations. Where the Federal regulation gave Illinois discretion to adopt regulations not required by the Federal Act, a comparable Federal Act requirement does not exist and *Consolidated Coal* does not apply. Some commentators have argued that section 1.02(c) is merely part of a general purpose clause and "not a binding mandate to the Illinois Department of Mines and Minerals." (Beck, *Illinois Coal Mine Subsidence Law Updated,* 1985 S. Ill. U.L.J. 379, 416 (1985).) Again, we need not address the merits of this argument because we find the IDMM regulations are in fact not more stringent than the Federal Act.

We next address the issue of whether the duty to repair or restore structures damaged by subsidence can be extended to damage resulting from longwall mining. Section 4.02 of the Illinois Act pro-

---

[6]Section 1.02(c) provides:
"It is also the purpose of this Act to establish requirements that are no more stringent than those required to meet the Federal Surface Mining Control and Reclamation Act of 1977 (PL 95—87)." Ill. Rev. Stat. 1981, ch. 96½, par. 7901.02(c).

vides that coal operators must adopt measures to prevent subsidence damage to the extent technologically and economically feasible, except in those instances where the mining technology used requires planned subsidence. (Ill. Rev. Stat. 1981, ch. 96½, par. 7904.02.) Longwall mining is such a technology. (1977 U.S. Code Cong. & Admin. News 658.) As we have indicated previously, the IDMM has statutory authority to require repair or restoration of subsidence damage and such requirement does not run afoul of section 1.02(c) of the Illinois Act, but the question raised is whether the exception contained in section 4.02 for technologies involving planned subsidence means that where such technologies are used, coal operators are exempt from the duty to repair or restore structures damaged by subsidence.

■ Reading the exception clause in section 4.02 as broadly as Old Ben urges would mean that while coal operators using mining technologies which *may* result in subsidence would be required to repair or restore structures damaged by subsidence if subsidence occurred, operators using mining techniques *certain* to cause subsidence would be free from any such duty. Old Ben would have us read section 4.02 as giving longwall mines the right to subside and destroy the property of others with impunity. We find this position "[un]tenable within the Anglo-American system of jurisprudence." (See Beck, *Illinois Coal Mine Subsidence Law Updated*, 1985 S. Ill. U.L.J. 379, 422 (1985).) Such an argument was rejected in *Melvin v. Old Ben Coal Co.* (S.D. Ill. 1985), 610 F. Supp. 131. Like the court in *Melvin*, we cannot believe that the legislature intended such an anomalous result. Further, the language of the statute itself does not support Old Ben's argument. Section 4.02 refers to *prevention* of subsidence. Coal operators must adopt measures to *prevent* subsidence damage except where mining techniques involving planned subsidence are being utilized. Coal operators using such techniques are thus relieved from the duty to prevent subsidence, which only makes sense. It would be illogical to require coal operators utilizing techniques involving planned subsidence to take steps to prevent subsidence. Were it not for the exclusion, section 4.02 could be read to prevent longwall mining. This is a far cry, however, from relieving coal operators of any responsibility to repair or restore subsidence damage. We do not believe this was the legislature's intent. We believe the most logical interpretation of the exclusion clause is that coal operators using techniques involving planned subsidence have no duty to prevent subsidence, but still must repair or restore any damage to surface lands and structures.

We find support for our interpretation of section 4.02 in *Shell Pipe Line Corp. v. Old Ben Coal Co.* (S.D. Ill. 1988), 677 F. Supp. 572. In that case, Shell brought suit to recover money it spent to protect a pipeline from subsidence damage. The IDMM ruled that while Old Ben was responsible for curing all physical damage resulting from its mining, it was exempted from the prevention requirements of the Illinois Act because it was using a planned subsidence method of extraction. Noting that courts commonly accord great deference to the statutory interpretation of an agency charged with administration thereof, the district court agreed. *Shell*, 677 F. Supp. at 575.

■ Old Ben next argues that the repair or restoration requirements unlawfully "take" Old Ben's surface support waivers in violation of the United States and Illinois Constitutions. A similar argument was rejected in *Keystone Bituminous Coal Association v. DeBenedictis* (1987), 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232. In *Keystone,* the petitioners challenged certain sections of the Pennsylvania Subsidence Act, which prohibited coal mining which caused subsidence to preexisting public buildings, dwellings, and cemeteries. The petitioners argued that they had subjacent support waivers relieving them of liability for subsidence damage to structures, and that the implementation of the Act constituted an unconstitutional taking as well as an unconstitutional impairment of their contract rights. Petitioners relied primarily on *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158, wherein the court held that the Pennsylvania legislature exceeded its constitutional powers when it prohibited the mining of anthracite coal in a manner that would cause subsidence of land on which certain structures were located. Critical to the court's decision in *Pennsylvania Coal* was the finding that the Kohler Act, the statute in question, was a "private benefit statute" because it did not apply to land where the surface was owned by the owner of the coal. Noting that the test for determining whether a land use regulation constituted an unconstitutional taking was whether the regulation substantially advanced legitimate State interests or denied an owner economically viable use of his land (*Keystone*, 480 U.S. at 484-85, 94 L. Ed. 2d at 488, 107 S. Ct. at 1242), the court distinguished *Pennsylvania Coal* on the basis that the legislative declaration in the Pennsylvania Subsidence Act demonstrated that Pennsylvania was seeking to protect the public interest in health, the environment, and the fiscal integrity of the area, not just private landowners' dwellings. We find that the legislative declaration set forth in section 1.02(a) of the Illinois Act demonstrates similar public interest

in health, safety and general welfare.[7] We further find that the IDMM regulations requiring the repair or restoration of structures damaged by subsidence seek to achieve these interests. Old Ben would distinguish *Keystone* on the basis that the IDMM regulations do not achieve a stated public purpose in preventing subsidence damage to structures. We are not persuaded by Old Ben's distinction. As to the second aspect of the *Keystone* test, Old Ben fails, as did plaintiffs in *Keystone*, to allege any facts or advance any argument from which we could conclude that Old Ben will be deprived of the economic use of its property (see *Keystone*, 480 U.S. at 493-99, 94 L. Ed. 2d at 493-97, 107 S. Ct. at 1246-50) and so we need discuss this no further.

■ Old Ben also argues that the repair or restoration requirement unlawfully "impairs" its contractual rights, *i.e.*, the subjacent support waivers contained in the deeds and coal leases. The plaintiffs in *Keystone* similarly argued that the Pennsylvania Subsidence Act substantially impaired their support waivers in violation of the contracts clause. The court indicated that the threshold inquiry to challenges under the contract clause is whether the State law has substantially impaired a contractual relationship. If so, the next in-

---

[7]Section 1.02(a) provides that

"[i]t is declared to be the policy of this State to provide for conservation and reclamation of lands affected by surface and underground coal mining in order to restore them to optimum future productive use and to provide for their return to productive use including but not limited to: the planting of forests; the seeding of grasses and legumes for grazing purposes; the planting of crops for harvest; the enhancement of wildlife and aquatic resources; the establishment of recreational, residential and industrial sites; the establishment of new bodies of water for recreational, agricultural, and wildlife conservation purposes; and for the conservation, development, management, and appropriate use of all the natural resources of such areas for compatible multiple purposes, to aid in maintaining or improving the tax base; and protecting the health, safety and general welfare of the people, the natural beauty and aesthetic values, and enhancement of the environment in the affected areas of the State; to prevent erosion, stream pollution, water, air and land pollution and other injurious effects to persons, property, wildlife and natural resources; to assure that the coal supply essential to the Nation's and State's energy requirements, and to their economic well-being is provided; to strike a balance between protection of the environment and agricultural productivity, and the Nation's need for coal as a source of energy; and to assure that land conservation and reclamation plans for all mining operations are available for the prior consideration of the public, and of county governments within whose jurisdiction such lands will be affected by coal mining." Ill. Rev. Stat. 1981, ch. 96½, par. 7901.02(a).

quiry is whether there is a significant and legitimate public interest behind the regulation. Finally, once the public interest has been identified, the court must determine the adjustment to the parties' rights and responsibilities is reasonable and appropriate to the purpose of the regulation. The court in *Keystone* found that the Pennsylvania Subsidence Act served a legitimate public interest and, as noted above, we likewise conclude that section 1.02(a) of the Illinois Act and the IDMM's permit repair or restoration requirements demonstrate a legitimate public interest. While Old Ben would quibble about the propriety of the IDMM's regulations in accomplishing the purpose of the Illinois Act, this court will defer to the legislature's judgment as to the most effective way to achieve the public purpose in question as did the Supreme Court in *Keystone*.

For the reasons aforesaid, the judgment of the circuit court of Franklin County is affirmed.

Affirmed.

CHAPMAN and GOLDENHERSH, JJ., concur.